## TORCASO *v.* WATKINS, CLERK.

No. 373.   Argued April 24,.1961.—Decided June 19, 1961.

*Leo Pfeffer* and *Lawrence Speiser* argued the cause for appellant.   With them on the briefs were *Joseph A. Sickles, Carlton R. Sickles, Bruce N. Goldberg, Rowland Watts* and *George Kaufmann.*

*Thomas B. Finan,* Attorney General of Maryland, and *Joseph S. Kaufman,* Deputy Attorney General, argued the cause and-filed a brief for appellee.   *C. Ferdinand Sybert,* former Attorney General of Maryland, and *Stedman Prescott, Jr.,* former Deputy Attorney General, appeared with *Mr. Kaufman* on the motion to dismiss or affirm.

Briefs of *amici curiae,* urging reversal, were filed by *Herbert A. Wolff* and *Leo Rosen* for the American Ethical Union, and by *Herbert B. Ehrmann, Lawrence Peirez, Isaac G. McNatt, Abraham Blumberg, Arnold Forster, Paul Hartman, Theodore Leskes, Edwin J. Lukas* and *Sol Rabkin* for the American Jewish Committee et al.

MR. JUSTICE BLACK delivered the opinion of the Court.

Article 37 of the Declaration of Rights of the Maryland Constitution provides:

> "[N]o religious test ought ever to be required as a qualification for any office of profit or trust in this State, other than a declaration of belief in the existence of God . . . ."

The appellant Torcaso was appointed to the office of Notary Public by the Governor of Maryland but was refused a commission to serve because he would not declare his belief in God. He then brought this action in a Maryland Circuit Court to compel issuance of his commission, charging that the State's requirement that he declare this belief violated "the First and Fourteenth Amendments to the Constitution of the United States . . . ."[1] The Circuit Court rejected these federal constitutional contentions, and the highest court of the State, the Court of Appeals, affirmed,[2] holding that the state constitutional provision is self-executing and requires declaration of belief in God as a qualification for office without need for implementing legislation. The case is therefore properly here on appeal under 28 U. S. C. § 1257 (2).

There is, and can be, no dispute about the purpose or effect of the Maryland Declaration of Rights requirement before us—it sets up a religious test which was designed to

---

[1] Appellant also claimed that the State's test oath requirement violates the provision of Art. VI of the Federal Constitution that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." Because we are reversing the judgment on other grounds, we find it unnecessary to consider appellant's contention that this provision applies to state as well as federal offices.

[2] 223 Md. 49, 162 A. 2d 438. Appellant's alternative contention that this test violates the Maryland Constitution also was rejected by the state courts.

and, if valid, does bar every person who refuses to declare a belief in God from holding a public "office of profit or trust" in Maryland. The power and authority of the State of Maryland thus is put on the side of one particular sort of believers—those who are willing to say they believe in "the existence of God." It is true that there is much historical precedent for such laws. Indeed, it was largely to escape religious test oaths and declarations that a great many of the early colonists left Europe and came here hoping to worship in their own way. It soon developed, however, that many of those who had fled to escape religious test oaths turned out to be perfectly willing, when they had the power to do so, to force dissenters from their faith to take test oaths in conformity with that faith. This brought on a host of laws in the new Colonies imposing burdens and disabilities of various kinds upon varied beliefs depending largely upon what group happened to be politically strong enough to legislate in favor of its own beliefs. The effect of all this was the formal or practical "establishment" of particular religious faiths in most of the Colonies, with consequent burdens imposed on the free exercise of the faiths of nonfavored believers.[3]

There were, however, wise and far-seeing men in the Colonies—too many to mention—who spoke out against test oaths and all the philosophy of intolerance behind them. One of these, it so happens, was George Calvert (the first Lord Baltimore), who took a most important part in the original establishment of the Colony of Maryland. He was a Catholic and had, for this reason, felt compelled by his conscience to refuse to take the Oath of Supremacy in England at the cost of resigning from high governmental office. He again refused to take that oath when it was demanded by the Council of the Colony of

---

[3] See, *e. g.*, I Stokes, Church and State in the United States, 358–446. See also cases cited, note 7, *infra.*

Virginia, and as a result he was denied settlement in that Colony.[4]   A recent historian of the early period of Maryland's life has said that it was Calvert's hope and purpose to establish in Maryland a colonial government free from the religious persecutions he had known—one "securely beyond the reach of oaths . . . ."[5]

When our Constitution was adopted, the desire to put the people "securely beyond the reach" of religious test oaths brought about the inclusion in Article VI of that document of a provision that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."   Article VI supports the accuracy of our observation in *Girouard* v. *United States,* 328 U. S. 61, 69, that "[t]he test oath is abhorrent to our tradition."   Not satisfied, however, with Article VI and other guarantees in the original Constitution, the First Congress proposed and the States very shortly thereafter

---

[4] The letter from the Virginia Council to the King's Privy Council is quoted in Hanley, Their Rights and Liberties (Newman Press 1959), 65, as follows:

"According to the instructions from your Lordship and the usual course held in this place, we tendered the oaths of supremacy and allegiance to his Lordship[;] [Baltimore] and some of his followers, who making profession of the Romish Religion, utterly refused to take the same. . . .   His Lordship then offered to take this oath, a copy whereof is included . . . but we could not imagine that so much latitude was left for us to decline from the prescribed form, so strictly exacted and so well justified and defended by the pen of our late sovereign, Lord King James of happy memory. . . .   Among the many blessings and favors for which we are bound to bless God . . . there is none whereby it hath been made more happy than in the freedom of our Religion . . . and that no papists have been suffered to settle their abode amongst us. . . .".

Of course this was long before Madison's great Memorial and Remonstrance and the enactment of the famous Virginia Bill for Religious Liberty, discussed in our opinion in *Everson* v. *Board of Education,* 330 U. S. 1, 11–13.

[5] Hanley, *op. cit., supra,* p. 65.

adopted our Bill of Rights, including the First Amendment.[6] That Amendment broke new constitutional ground in the protection it sought to afford to freedom of religion, speech, press, petition and assembly. Since prior cases in this Court have thoroughly explored and documented the history behind the First Amendment, the reasons for it, and the scope of the religious freedom it protects, we need not cover that ground again.[7] What was said in our prior cases we think controls our decision here.

In *Cantwell* v. *Connecticut*, 310 U. S. 296, 303–304, we said:

> "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. . . . Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."

Later we decided *Everson* v. *Board of Education,* 330 U. S. 1, and said this at pages 15 and 16:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor

---

[6] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[7] See, *e. g.,* the opinions of the Court and also the concurring and dissenting opinions in *Reynolds* v. *United States,* 98 U. S. 145; *Davis* v. *Beason,* 133 U. S. 333; *Cantwell* v. *Connecticut,* 310 U. S. 296; *West Virginia State Bd. of Education* v. *Barnette,* 319 U. S. 624; *Fowler* v. *Rhode Island,* 345 U. S. 67; *Everson* v. *Board of Education,* 330 U. S. 1; *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203; *McGowan* v. *Maryland,* 366 U. S. 420.

the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' "

While there were strong dissents in the *Everson* case, they did not challenge the Court's interpretation of the First Amendment's coverage as being too broad, but thought the Court was applying that interpretation too narrowly to the facts of that case. Not long afterward, in *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, we were urged to repudiate as dicta the above-quoted *Everson* interpretation of the scope of the First Amendment's coverage. We declined to do this, but instead strongly reaffirmed what had been said in *Everson,* calling attention to the fact that both the majority and the minority in *Everson* had agreed on the principles declared in this part of the *Everson* opinion. And a concurring opinion in *McCollum,* written by Mr. Justice Frankfurter and joined by the other *Everson* dissenters, said this:

"We are all agreed that the First and Fourteenth Amendments have a secular reach far more penetrat-

ing in the conduct of Government than merely to forbid an 'established church.' . . . We renew our conviction that 'we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion.' " [8]

The Maryland Court of Appeals thought, and it is argued here, that this Court's later holding and opinion in *Zorach* v. *Clauson*, 343 U. S. 306, had in part repudiated the statement in the *Everson* opinion quoted above and previously reaffirmed in *McCollum*. But the Court's opinion in *Zorach* specifically stated: "We follow the *McCollum* case." 343 U. S., at 315. Nothing decided or written in *Zorach* lends support to the idea that the Court there intended to open up the way for government, state or federal, to restore the historically and constitutionally discredited policy of probing religious beliefs by test oaths or limiting public offices to persons who have, or perhaps more properly profess to have, a belief in some particular kind of religious concept. [9]

---

[8] 333 U. S., at 213, 232. Later, in *Zorach* v. *Clauson*, 343 U. S. 306, 322, MR. JUSTICE FRANKFURTER stated in dissent that "[t]he result in the McCollum case . . . was based on principles that received unanimous acceptance by this Court, barring only a single vote."

[9] In one of his famous letters of "a Landholder," published in December 1787, Oliver Ellsworth, a member of the Federal Constitutional Convention and later Chief Justice of this Court, included among his strong arguments against religious test oaths the following statement:

"In short, test-laws are utterly ineffectual: they are no security at all; because men of loose principles will, by an external compliance, evade them. If they exclude any persons, it will be honest men, men of principle, who will rather suffer an injury, than act contrary to the dictates of their consciences. . . ." Quoted in Ford, Essays on the Constitution of the United States, 170. See also 4 Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution, 193.

We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person "to profess a belief or disbelief in any religion." Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers,[10] and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.[11]

In upholding the State's religious test for public office the highest court of Maryland said:

> "The petitioner is not compelled to believe or disbelieve, under threat of punishment or other compulsion. True, unless he makes the declaration of belief he cannot hold public office in Maryland, but he is not compelled to hold office."

The fact, however, that a person is not compelled to hold public office cannot possibly be an excuse for barring him

[10] In discussing Article VI in the debate of the North Carolina Convention on the adoption of the Federal Constitution, James Iredell, later a Justice of this Court, said:

". . . [I]t is objected that the people of America may, perhaps, choose representatives who have no religion at all, and that pagans and Mahometans may be admitted into offices. But how is it possible to exclude any set of men, without taking away that principle of religious freedom which we ourselves so warmly contend for?"

And another delegate pointed out that Article VI "leaves religion on the solid foundation of its own inherent validity, without any connection with temporal authority; and no kind of oppression can take place." 4 Elliot, *op. cit., supra,* at 194, 200.

[11] Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others. See *Washington Ethical Society* v. *District of Columbia,* 101 U. S. App. D. C. 371, 249 F. 2d 127; *Fellowship of Humanity* v. *County of Alameda,* 153 Cal. App. 2d 673, 315 P. 2d 394; II Encyclopaedia of the Social Sciences 293; 4 Encyclopaedia Britannica (1957 ed.) 325–327; 21 *id.,* at 797; Archer, Faiths Men Live By (2d ed. revised by Purinton), 120–138, 254–313; 1961 World Almanac 695, 712; Year Book of American Churches for 1961, at 29, 47.

from office by state-imposed criteria forbidden by the Constitution. This was settled by our holding in *Wieman* v. *Updegraff,* 344 U. S. 183. We there pointed out that whether or not "an abstract right to public employment exists," Congress could not pass a law providing " '. . . that no federal employee shall attend Mass or take any active part in missionary work.' " [12]

This Maryland religious test for public office unconstitutionally invades the appellant's freedom of belief and religion and therefore cannot be enforced against him.

The judgment of the Court of Appeals of Maryland is accordingly reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN concur in the result.

---

[12] 344 U. S., at 191–192, quoting from *United Public Workers* v. *Mitchell,* 330 U. S. 75, 100.